# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF KENTUCKY
### LOUISVILLE DIVISION
### CIVIL ACTION NO. 3:14-CV-00751

GENEVA THOMPSON, *et al.*                                          Plaintiffs,

v.

HAROLD L. CUNNINGHAM, *et al.*                                     Defendants.


## MEMORANDUM OPINION AND ORDER


This matter comes before the Court upon the Motion to Dismiss filed by Defendants Harold L. Cunningham and DBHL Investments, LLC, doing business as ColorTyme Financial Services ("ColorTyme"), (Docket No. 18), to which Plaintiffs Geneva Thompson and Gary Estes have responded, (Docket No. 21), and Defendants have replied, (Docket No. 18). Fully briefed, the matter stands ripe for adjudication.

As an initial matter, the Court notes that Plaintiffs have moved to amend their initial complaint, (Docket No. 6). They seek to clarify their allegation the Defendants charged them unlawful fees, to add an allegation for intentional infliction of emotional distress, and to plead class allegations for various violations. Federal Rule of Civil Procedure 15(a)(1) provides that a "party may amend its pleading only with the opposing party's written consent or the court's leave." The rule directs that the "court should freely give leave when justice so requires." Fed. R. Civ. P. 15(a)(2). Based upon the court's review, Plaintiffs' motion to amend their complaint will be granted. The Court's analysis therefore addresses Plaintiffs' Amended Complaint.

**Factual Background**

Defendant Cunningham operates ColorTyme, a Louisville, Kentucky, establishment that specializes in making payday loans. Also known as "cash advances" or "deferred deposit transactions,"[1] lenders generally issue these short-term, high-interest loans with little consideration of the borrower's ability to repay them. The application process is convenient by design, with few questions asked and minimal paperwork required: even a consumer with shaky financial footing must provide only basic information and a postdated check to obtain cash, often within minutes of applying. Borrowers who take out such loans may become ensnared in debt as they pay additional fees to delay repayment.

The instant lawsuit arises from the series of payday loans that Plaintiffs Geneva Thompson and her son, Gary Estes, obtained from ColorTyme. Thompson, whose monthly Social Security payments constitute her only source of income, alleges that she remained indebted to ColorTyme for over two years and has paid over $2,000.00 on a $500.00 loan. (Docket No. 6-2 at 2, 6.) Estes contends that he remained in ColorTyme's debt for over nine months, having paid over $1,000.00 on a principal amount of $500.00. (Docket No. 6-2 at 2.)

As told by Plaintiffs, Thompson's transactions with ColorTyme began with a $200.00 loan issued in February 2012. Cunningham did not collect the applicable "service fee" at the time of the transaction. Instead, he instructed Thompson to give him a check left blank but for her signature, with no amount, payee, or date indicated. Thompson gave Cunningham such a check. She alleges that when her payment became due during the following month, she requested an additional $500.00 loan to purchase eyeglasses for her granddaughter. (Docket No. 6-2 at 5.) Cunningham agreed to advance Thompson an additional $300.00 and to roll the $200.00 owed from February into a new transaction. He advised her to keep the $200.00 cash that she had planned to repay him and to pay only the $36.00 service fee.

---

[1] According to Kentucky law, a "'deferred deposit transaction' . . . means, for consideration, accepting a payment instrument, and holding the payment instrument for a period of time prior to deposit or presentment in accordance with an agreement with or any representation made to the customer whether express or implied." KRS 286.9-010(14).

2

Because Thompson was unable to travel to ColorTyme, Cunningham came to her home to finalize the transaction.  She contends that after she paid the service fee, Cunningham told her to sign on two lines of an otherwise blank sheet of paper; he then gave her the $300.00 and advised that she would incur a monthly $90.00 "service fee" until the balance was paid.  (Docket No. 6-2 at 5-6.)  Thompson alleges that Cunningham has required additional signed but otherwise blank checks to accompany each of her $90.00 monthly payments.  (Docket No. 6-2.)

On June 23, 2014, Thompson learned that her bank account had been overdrawn, leaving her unable to purchase necessities until the next month's Social Security check arrived.  During Thompson's telephone conversation with her bank regarding the overdraft, Cunningham arrived at her home to collect a check.  Thompson explained to him that she would be unable to make her payment for June and asked if she could instead make a double payment in July.  She alleges that Cunningham then asked for her debit card, ran it through a program on his cell phone, and showed her a message indicating that the card had been rejected.  (Docket No. 6-2 at 7.)  Cunningham then drafted a contract that authorized him to apply a $180.00 charge to Thompson's card on July 16, 2014.  The contract continued, "I give him permission to debit my card for the $180.00 amount and then $90.00 every month after till [sic] paid in full."  (*See* Docket No. 6-2 at 7.)  Cunningham then made a phone call and left, taking the document with him.  Thompson states that she does not recall having signed this contract.  (Docket No. 6-2 at 7.)  After Cunningham left her home, Thompson called ColorTyme and spoke to another individual who told her that he had charged $5.00 to her debit card and that the transaction was accepted.  Thompson alleges that this debit caused additional overdraft charges.

On July 14, 2014, Thompson left Cunningham a voicemail message advising him not to debit her account until she could verify that the funds were available.  She left a similar message on the following day.  Thompson contends that despite these requests, Cunningham debited her account for $180.00 without her authorization, causing her to incur overdraft charges.

3

Thompson's son, Gary Estes, engaged in similar transactions with ColorTyme.  On January 3, 2014, Estes borrowed $500.00 and told Cunningham that he planned to pay the balance upon receiving his tax refund.  On January 18, 2014, Estes made a $90.00 payment.  Thompson alleges that on February 20, 2014, Cunningham told her that she had guaranteed Estes' debt and assessed her a $90.00 payment on his account.  (Docket No. 6-2 at 6.)  On March 1, 2014, after Estes had received his tax refund, he traveled to ColorTyme and paid the $590.00 balance on his account.  After Estes left the store, Cunningham called him to advise that the payment was applied not to Estes' own account, but that of his sister, leaving Estes with an outstanding balance of $589.25.  Cunningham continued to charge Estes the $90.00 "service fee" associated with the loan and demanded that Estes provide a signed check, otherwise left blank, with each payment.  (Docket No. 6-2 at 8.)

On March 11, 2014, Estes traveled to ColorTyme to speak with Cunningham about settling the debt.  Estes alleges that Cunningham led him into a back room, where he drafted a contract that required Estes to pay $100.00 for six months, beginning on March 21, 2014, for a loan issued on February 21, 2014.  According to the contract, Estes would be liable for attorney fees, court costs, and filing fees if he failed to issue timely payments.  (Docket No. 6-2 at 8.)  Estes made these $100.00 payments to ColorTyme thereafter, generally on the twenty-first day of each month.

When Estes failed to make his May 2014 payment, Cunningham cautioned via text message that he would file a lawsuit if Estes did not pay by the following Tuesday.  He threatened to serve Estes with court papers at his place of employment.  (Docket No. 6-2 at 9; Exhibit 2 at 20.)  Cunningham also noted that in the event that a lawsuit was filed, Estes' debt would  "go[] back to the full balance plus attorney fees and late fees and [court] cost along with court fines and interest and would be right at around $1125." (Docket No. 6-2 at 9; Exhibit 3 at 22.)  After Cunningham indicated that he had communicated with Estes' supervisor about the matter, Estes paid $50.00.  (Docket No. 6-2 at 9; Exhibit 4 at 24.)  On June 23, 2014, Cunningham sent Estes an additional text message:  "[I]f I don't have the check in my office by 9 [a.m.] you have defaulted on our contract agreement and it will then be the full amount plus attorney fees

4

and court cost along with fine[,] per the contract you signed on camera with my office." (Docket No. 6-2 at 9; Exhibit 5 at 26.)

On August 21, 2014, Estes left work to make his final payment at ColorTyme's office before its 6:00 p.m. closing time. At approximately 5:20 p.m., Estes called Cunningham to advise that he was en route. Cunningham replied that he would not be in the store to accept the payment. The men argued until Cunningham ended the call, prompting Estes to drive to his home rather than to ColorTyme's office. At 6:05 p.m., Cunningham informed Estes that he was in default for failing to remit his final payment. (Docket No. 6-2 at 9-10.) On August 23, 2014, Estes traveled to ColorTyme to make this payment. He alleges that Cunningham demanded payment of an additional $200.00 over the next two months to avoid court proceedings. (Docket No. 6-2 at 10.)

Thompson and Estes now assert that the actions and omissions of Cunningham and ColorTyme constitute fraudulent omission, intentional infliction of emotional distress, usury, violation of the Kentucky Consumer Protection Act, and violation of the Truth in Lending Act.

**Legal Standard**

Although Defendants styled their motion as one to dismiss claims pursuant to Federal Rule of Civil Procedure 12(b)(6), it is accompanied by several exhibits outside of the pleadings. Such documents include an affidavit produced by Cunningham, various consumer loan agreements that Thompson and Estes purportedly signed, court documents associated with Thompson's petition for bankruptcy, ColorTyme's examination by the Kentucky Department of Financial Institutions, and the handwritten debit authorization that ostensibly bears Thompson's signature. (Dockets Nos. 18-2, 18-3, 18-4, 18-5, 18-6, 18-7, and 18-8.)

Plaintiffs argue that the Court must convert the motion into one for summary judgment under Federal Rule of Civil Procedure 12(d). Pursuant to Rule 12(d), "[i]f, on a motion under Rule 12(b)(6) or 12(c), matters outside the pleadings are presented to and not excluded by the court, the motion must be

treated as one for summary judgment under Rule 56."  A district court has broad discretion in determining whether to convert a motion to dismiss to one for summary judgment but must afford all parties a reasonable opportunity to present all material pertinent to the motion.  *Bruce v. Correctional Medical Servs., Inc.*, 389 Fed. App'x 462, 465 (6th Cir. 2010); Fed. R. Civ. P. 12(d).  The Court is satisfied that all parties enjoyed ample notice of the motion's conversion and will consider the exhibits before it at this time.  Where appropriate, the motion will be weighed under the summary judgment standard.

Summary judgment is appropriate where the pleadings, the discovery and disclosure materials on file, and any affidavits reflect "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  "[N]ot every issue of fact or conflicting inference presents a genuine issue of material fact."  *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1477 (6th Cir. 1989).  The key inquiry is whether the party bearing the burden of proof has presented a jury question as to each element in the case.  *Hartsel v. Keys*, 87 F.3d 796, 799 (6th Cir. 1996).  Moreover, while the substantive law of Kentucky applies to Plaintiffs' state law claims pursuant to *Erie R.R. v. Tompkins*, 304 U.S. 64 (1938), the Court will apply the standards of Federal Rule of Civil Procedure 56 rather than Kentucky's summary judgment standard.  *See Gafford v. Gen. Elec. Co.*, 997 F.2d 150, 165 (6th Cir. 1993), *abrogated on other grounds by Hertz Corp. v. Friend*, 130 S. Ct. 1181 (2010).

The Court will apply the 12(b)(6) standard to those claims to which the exhibits are not germane. "When considering a motion to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, the district court must accept all of the allegations in the complaint as true, and construe the complaint liberally in favor of the plaintiff."  *Lawrence v. Chancery Court of Tenn.*, 188 F.3d 687, 691 (6th Cir. 1999) (citing *Miller v. Currie*, 50 F.3d 373, 377 (6th Cir. 1995)).  To survive a Rule 12(b)6) motion to dismiss, the complaint must include "only enough facts to state a claim to relief that is plausible on its face." *Bell Atl. v. Twombly*, 550 U.S. 544, 570 (2007); *see also Ashcroft v. Iqbal*, 129 S.Ct. 1937, 1950 (2009).  The "[f]actual allegations in the complaint must be enough to raise a right to relief above the speculative level on the assumption that all the allegations in the complaint are true." *Twombly*, 550 U.S.

at 555 (internal citation and quotation marks omitted).   A plaintiff must allege sufficient factual allegations to afford the defendants fair notice concerning the nature of the claims and the grounds upon which they rest.  *Id.*

**Analysis**

### I.      Judicial estoppel

Defendants first contend that they are entitled to judgment as a matter of law as to several of Thompson's claims, relying on the doctrine of judicial estoppel.  They argue that she improperly failed to list her claims for fraudulent omission, violations of the Kentucky Consumer Protection Act, usury, and violations of the Truth in Lending Act in her bankruptcy court filings of August 31, 2012.[2]

Section 521(1) requires a debtor to file "a schedule of assets and liabilities, a schedule of current income and current expenditures, and a statement of the debtor's financial affairs."  11 U.S.C. § 521(1). A cause of action constitutes an asset that must be scheduled pursuant to this provision.  *See Eubanks v. CBSK Fin. Group, Inc.*, 385 F.3d 894, 897 (6th Cir. 2004).   Further, "[t]he duty of disclosure is a continuing one, and a debtor is required to disclose all potential causes of action."  *In re Coastal Plains, Inc.*, 179 F.3d 197, 208 (5th Cir. 1999) (quoting *Youngblood Group v. Lufkin Fed. Savings & Loan Ass'n*, 932 F. Supp. 859, 867 (E.D. Tex. 1996)).   A debtor's duty to disclose is essential to the bankruptcy system:  "[T]he disclosure obligations of consumer debtors are at the very core of the bankruptcy process and meeting these obligations is part of the price debtors pay for receiving the bankruptcy discharge."  *In re Colvin*, 288 B.R. 477, 481 (Bankr. E.D. Mich. 2003).

Given Thompson's error, the Court consider whether it constitutes the "intentional self-contradiction . . . as a means of obtaining unfair advantage" contemplated by the doctrine of judicial estoppel.  *New Hampshire v. Maine*, 532 U.S. 742, 751 (2001).  "Judicial estoppel forbids a party from

---

[2] The parties dispute the number of deferred deposit transactions into which Thompson had entered at this point. Defendants allege that when she filed for bankruptcy in July 2012, Thompson had entered into six such transactions. (Docket No. 18-1 at 5.)  Plaintiffs contend that such allegations are superfluous to the pleadings and that Thompson had entered into only two such transactions, with the first being rolled into the second.  (Docket No. 21 at 10.)

taking a position inconsistent with one successfully and unequivocally asserted by that same party in an earlier proceeding." *Warda v. C.I.R.*, 15 F.3d 533, 538 (6th Cir. 1994). This equitable doctrine safeguards the integrity of the courts by barring attempts at "cynical gamesmanship" by those who would "achiev[e]success on one position, then argu[e] the opposite to suit an exigency of the moment." *Eubanks*, 385 F.3d at 897 (quoting *Teledyne Indus., Inc. v. NLRB*, 911 F.2d 1214, 1218 (6th Cir. 1990)). However, the doctrine must be applied with caution in order to "'avoid impinging on the truth-seeking function of the court, because the doctrine precludes a contradictory position without examining the truth of either statement.'" *Id.* (quoting *Teledyne Indus.*, 911 F.2d at 1218)). The Sixth Circuit directs that in weighing the applicability of judicial estoppel, district courts should consider evidence that a debtor omitted a claim from a prior bankruptcy proceeding only inadvertently. *Eubanks*, 385 F.3d at 899.

Here, Plaintiffs acknowledge that Thompson failed to disclose the claims at issue and that the bankruptcy court ultimately adopted her omission. (*See* Docket Nos. 18-5, 18-6.) However, there is no indication that Thompson's omission was an effort to "play[] fast and loose with the courts" or to "blow[] hot and cold as the occasion demands." *Reynolds v. C.I.R.*, 861 F.2d 469, 472 (6th Cir. 1988) (internal citations omitted). Moreover, the Court notes Thompson's allegation that she continued to pay $90.00 to Defendants each month for almost two years after she filed for bankruptcy. (*See* Docket No. 21 at 10.) Thompson's oversight does not appear to be an attack on the Court's dignity. *See Lewis v. Weyerhaeuser Co.*, 141 Fed. App'x 420, 425-26 (6th Cir. 2005) (noting that failure to disclose a cause of action may be deemed inadvertent where "(1) the debtor lacks the knowledge of the factual basis of the undisclosed claims, or (2) the debtor has no motive for concealment.") (internal quotations and citations omitted). Accordingly, applying judicial estoppel to bar Thompson's claims would be "an inappropriate resolution, rather than a necessary judicial measure to protect the court's interest." *Eubanks*, 385 F.3d at 898.

## II.        Fraudulent omission

The Court next turns to Plaintiffs' claim for fraudulent omission.  To succeed, Plaintiffs must prove "(a) a duty to disclose a material fact; (b) a failure to disclose a material fact; and (c) that the failure to disclose a material fact induced the plaintiff to act and, as a consequence, (d) to suffer actual damages." *Waldridge v. Homeservices of Kentucky, Inc.*, 384 S.W.3d 165, 171 (Ky. Ct. App. 2011) (citing *Rivermont Inn, Inc. v. Bass Hotels & Resorts, Inc.*, 113 S.W.3d 636, 641 (Ky. Ct. App. 2003)).  Kentucky law imposes a duty to disclose on payday lenders, requiring licensed deposit service businesses to disclose in writing any fees charged for the service.  *See* KRS 286.9-100(1) ("Any fee charged by a licensee for . . . entering into a deferred deposit transaction shall be disclosed in writing to the bearer of the check prior to . . . entering into a deferred deposit transaction . . .").  In their Amended Complaint, Plaintiffs allege that Defendants failed to make such disclosures before entering into the transactions at issue.  (Docket No. 6-2 at 11.)

Defendants deny this allegation, pointing to Exhibits 1 and 2 of their response:  numerous Deferred Deposit and Disclosure Agreements, twenty-one purportedly signed by Thompson and two purportedly signed by Estes.  (*See* Docket Nos. 18-3, 18-4.)   On their faces, these documents provide the disclosures required by Kentucky statute.  They clearly explain—in large print and in a section entitled "Federal Truth-in-Lending Disclosures"—that Plaintiffs incurred a finance charge of $89.25 ("The dollar amount the credit will cost you") for a $500 loan ("The amount of credit provided to you or on your behalf"), for a total of $589.25 ("The amount you will have paid after you made all payments as scheduled").  The Agreements also indicate the Annual Percentage Rate (APR) associated with each loan. (*See* Docket No. 18-3.)

But Plaintiffs say that although these documents ostensibly bear their signatures, they do not tell the whole story.  Plaintiffs challenge the authenticity of the provided signatures, arguing that because they are not verified, they pose a genuine issue of material fact.  Thompson has averred under oath, "I do not

9

recognize the Deferred Deposit and Disclosure Agreements that Defendants have produced, and I did not sign them." (Docket No. 21-1, Thompson Aff., at ¶ 34.)[3]

This factual dispute will turn largely upon the credibility and testimony of the two sides at trial. Although Defendants may challenge Thompson's veracity, such questions are generally entrusted to the jury, not the Court. *See, e.g.*, *United States v. Williams*, No. 04-73603, 2005 WL 1343389 (E.D. Mich. May 26, 2005) (denying plaintiff's motion for summary judgment in light of defendant's assertion that he did not sign the note at issue). Because summary judgment remains inappropriate when "the evidence presents a sufficient disagreement to require submission to a jury," the Court will deny Defendants' motion as to this issue. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986).

Numerous other questions of fact render summary judgment inappropriate at this stage. For example, Plaintiffs contend that on several occasions, Thompson's children delivered blank checks to Cunningham on her behalf, either along with her $90.00 payment or after she had paid via debit card. (Docket No. 21 at 11.) Estes submits that at least once, he left a blank check at his home for Cunningham to pick up while Estes was at work. (Docket No. 21 at 11-12.) Plaintiffs insist that they neither received nor signed new agreements for such transactions. In addition, other evidence suggests that the Agreements did not properly disclose the applicable monthly fee. As stated above, the Agreements notified Plaintiffs that they would be charged $89.25 per month. However, Thompson's bank statements reflect multiple $90.00 charges from ColorTyme; in the Court's review, no charges were made for $89.25. (*See* Docket No. 21-1.) Defendants' own evidence accords with this higher amount, as the debit authorization that Cunningham drafted states that Thompson would be charged $180.00 in July 2014 "and then $90 every month after till [sic] paid in full." (Docket No. 18-8.) This discrepancy poses a factual dispute that need not be resolved at this early stage.

---

[3] The Court notes that Plaintiffs have recently submitted a document concerning the signatures' veracity entitled, "Supplement to Plaintiffs' Response to Defendants' Motion to Dismiss." (*See* Docket No. 24.) The Court will construe this document as a surreply. Neither the Federal Rules of Civil Procedure nor the Western District of Kentucky's Local Rules permit litigants to file additional evidence or a surreply without the Court's leave and a showing of good cause. *See* Local Rule 7.1 (permitting the filing of memoranda in response and reply to a motion). Because Plaintiffs did not seek such leave, the Court will not consider the filing and will strike it from the record.

However, the Court will dismiss the portion of Plaintiffs' claim asserting that Defendants failed to disclose Kentucky law's limits associated with deferred deposit transactions. Plaintiffs are correct that Kentucky law prohibits payday lenders from charging a service fee in excess of $15.00 per $100.00 on the face amount of the deferred deposit check. *See* KRS 286.9-100(1). But although the statute requires lenders to disclose their fees, it does not require them to disclose this statutory cap. Because no such duty exists, the Court will dismiss Plaintiffs' fraudulent omission claim to the extent that it relies upon this argument.

### III.     The Kentucky Consumer Protection Act

Plaintiffs further allege that Defendants engaged in unfair, false, misleading, or deceptive business practices in violation of the Kentucky Consumer Protection Act (KCPA). *See* KRS 367.170. The KCPA was enacted "to protect the public interest and the well-being of both the consumer public and the ethical sellers of goods and services." KRS 367.120. The statute creates a cause of action for consumers who allege that they have been harmed in violation of the Act.

> Any person who purchases . . . goods or services primarily for personal, family or household purposes and thereby suffers any ascertainable loss of money or property, real or personal, as a result of the use or employment by another person of a method, act or practice declared unlawful by KRS 367.170, may bring an action . . . to recover actual damages.

KRS 367.220. The statute defines "unlawful acts" as those that are "[u]nfair, false, misleading, or deceptive acts or practices in the conduct of any trade or commerce." KRS 367.170. It further defines "unfair" to mean unconscionable. *Id.*

Plaintiffs assert three separate claims labeled as violations of the KCPA, the first of which contains general allegations and the latter two concerning allegations specific to Thompson and Estes, respectively. The Court will examine each claim in turn.

### a.  **Claims as to all Plaintiffs**

### i.      **Claims concerning disclosures and agreements**

Plaintiffs first argue that Defendants violated the KCPA by violating the statutory requirements that govern deferred deposit lenders.  They allege seven distinct violations, three of which concern whether the transactions were accompanied by the appropriate agreements and disclosures.  Specifically, they contend that Defendants unlawfully failed to disclose their fees in writing; did not require signed and dated written agreements for each transaction; and did not afford Plaintiffs with the disclosures required by the Consumer Credit Protection Act.  *See* KRS 286.9-100(1); KRS 286.9-100(13); KRS 286.9-102.  In addition to the KCPA claims, Plaintiffs assert that Defendants failed to provide them with disclosures required by the Truth in Lending Act, including the cost of the loan as a finance charge and as an annual percentage rate.  *See* 15 U.S.C. § 1605.

In response, Defendants rely upon the same argument they levied as to Plaintiffs' fraudulent omission claim:  that twenty-three Deferred Deposit and Disclosure Agreements memorialized the transactions in writing and provided the required disclosures.  (*See* Docket Nos. 18-3, 18-4.)  However, as discussed *supra*, Plaintiffs allege that they failed to receive such Agreements in some cases and have challenged the authenticity of their purported signatures on those provided.  Moreover, the record contains contradictory evidence as to the total fee that Defendants actually charged; Thompson avers, and her bank statement reflects, that Defendants charged a fee in excess of the $89.25 that the provided disclosures indicate.  The claims mentioned above are riddled with factual disputes concerning the documentation that Plaintiffs actually received.  Accordingly, each withstands Defendants' motion.

### ii.     **Excessive service fees**

Defendants further move to dismiss the allegation that their service fee exceeded statutory limits. Kentucky law prohibits lenders from charging a service fee "in excess of fifteen dollars ($15) per one hundred dollars ($100) on the face amount of the deferred deposit check."  KRS 286.9-100(1).  At first

blush, the statute appears to authorize a maximum fee of 15%, with $115 due for a $100 loan, $230 due

for a $200 loan, and so on.

However, payday lenders have adopted an alternative interpretation: they consider the amount to

be advanced as 85% of the total charged amount, allowing them to impose a fee of $17.65 per $100.00

advanced.  As Defendants explain, "[I]f the face amount of the check a customer writes to a lender is

$100.00, $15.00 of the $100.00 is a service fee and $85.00 is the proceeds that the customer will receive

from the lender." (Docket No. 18-1 at 9.)   According to this interpretation, a lender can charge a 17.65%

service fee, calculated by dividing $15.00 by $85.00.  Therefore, an advance of $500.00—the statutory

maximum—may be accompanied by a service fee of $88.25. [4]   *See* KRS 286.9-100(9) ("The total

proceeds received by the customer from all of the deferred deposit transactions shall not exceed five

hundred dollars ($500)."  The statute also permits the lender to charge the customer the $1.00 fee

associated with posting the transaction to a statewide database.  *See* KRS 286.9-140(2).  This calculation

reflects that Defendants were permitted to charge Plaintiffs a maximum of $589.25 for each $500.00

loan—the base amount, plus the $88.25 service fee and the $1.00 database fee.

The Court again turns to Plaintiffs' allegations that Defendants charged them at least $90.00 per

month, an amount that exceeds the statutory minimum even according to its more generous interpretation.

Despite Defendants' continued reliance on the Agreements they produced, record evidence suggests a

genuine issue of material fact as to whether Defendants charged a fee in excess of the statutory limits.

Therefore, the Court rejects Defendants' motion in this regard.

### iii.  Requirement of payment instruments absent dates

The Court next turns to Plaintiffs' allegation that Defendants required them to remit undated

payment instruments each month:  blank checks, devoid of any content but for Plaintiffs' signatures.

Plaintiffs allege that by later filling in the date on these checks, Defendants unlawfully altered them.  *See*

---

[4] The Kentucky Department of Financial Institutions has apparently approved this formula, as its 2013 audit of ColorTyme reflects that Defendants complied with state law.  (*See* Docket No. 18-7, Report of Examination to the Department of Financial Institutions.)

KRS 286.9-100(6) ("No licensee shall alter or delete the date on any payment instrument accepted by the licensee.").  Plaintiffs reason that although they did not indicate a date on their checks, the checks nonetheless effectively had a date:  pursuant to Kentucky law, "If an instrument is undated, its date is the date of its issue . . . ."  KRS 355.3-113.  To either antedate or postdate a check, then, is to alter when it may be paid and after which it will no longer be honored.  *See* KRS 355.3-113(1) ("[A]n instrument payable on demand is not payable before the date of the instrument."); KRS 355.3-304 (a check becomes overdue ninety days after its date).

The parties are silent as to whether the dates that Defendants ultimately supplied altered the instruments' *de facto* dates—that is, their dates of issuance.  This question may prove essential to their claim.  Adding a date contrary to the date of issuance could be the functional equivalent of altering a date that the drawer supplied, as it would modify the parties' dates of obligation.  However, the same logic suggests that augmenting an undated check to reflect only the date of issuance would not constitute a true alteration, as the parties' obligations would remain the same.  The record is devoid of evidence to support either conclusion.  Accordingly, summary judgment as to this matter would be premature.

Moreover, the viability of Plaintiffs' claim also depends upon what additions, if any, Plaintiffs authorized Defendants to make to their instruments.  Kentucky law defines an "incomplete instrument" as "a signed writing . . . the contents of which show at the time of signing that it is incomplete but that the signer intended it to be completed by the addition of words or numbers."  KRS 355.3-115(1).  The statute further provides, "If words or numbers are added to an incomplete instrument *without authority of the signer*, there is an alteration of the incomplete instrument under KRS 355.3-407."  KRS 355.3-115(3) (emphasis added).  An alteration fraudulently made without the drawer's assent may discharge the parties' obligations.  *See* KRS 355.3-407.

Here, the understanding with which the Plaintiffs turned over their checks remains unclear.  The parties do not indicate whether they agreed upon a due date, nor do they indicate whether Defendants

complied with or exceeded the scope of their authority.  Additional information is required to determine whether an alteration occurred and its effect, if any, upon the instrument's validity.  Given the paucity of both evidence and argument as to this matter, the Court cannot say that Defendants are entitled to judgment as a matter of law at this time.  Accordingly, the Court will allow additional discovery upon this question.

### iv.    Oral agreements to charge excessive fees

Plaintiffs' fourth claim under the KCPA alleges that Defendants used oral agreements to charge fees beyond the statutory maximum.  (Docket No. 6-2 at 11.)  Plaintiffs contend that Defendants violated KRS 286.9-100(11), which prohibits a licensee from using "any device or agreement . . . with the intent to obtain greater charges than are authorized in this subtitle."   Defendants presume that this claim arises from Estes's allegation that Cunningham demanded an additional $200.00 for two months after his final payment to avoid legal action.  (*See* Docket No. 18-1 at 12.)  Assuming the veracity of Estes's allegation, the first such payment would have been due four days *after* Plaintiffs filed their Complaint.  Moreover, Defendants correctly observe that Estes fails to allege ever actually making such a payment—a point that Plaintiffs concede in their response.  (*See* Docket No. 21 at 16.)  Defendants therefore contend that Estes has suffered no "ascertainable loss of money or property" as required by the KCPA.  Plaintiffs admit that Estes did not suffer the monetary loss contemplated by this agreement but argue that an obligation to pay a debt constitutes an ascertainable loss, even if the debt is never collected.  (Docket No. 21 at 16.)

As this Court has noted, Kentucky precedents offer little guidance as to the meaning of "ascertainable loss" under the KCPA.  *See Parks v. Rainbow Rentals, Inc.*, No. 3:07-CV-00648-JGH, 2008 WL 2325154 at *3.  Given this absence, the Court has allowed cases to advance when a disputed debt is at issue, even if that debt has not been collected.  For example, in *Rainbow Rentals*, the Court permitted a KCPA claim based upon allegations that a furniture rental company wrongfully attempted to collect a disputed debt by posting the plaintiff's personal information outside her home.  *Id.*  Moreover, the Court has permitted a KCPA claim arising from a bank's unsuccessful attempts to collect a disputed

15

debt. *Id.* (citing *Stafford v. Cross Country Bank*, 262 F. Supp. 2d 776 (W.D. Ky. 2003)). Such cases are generally liberally construed at this stage, particularly given Kentucky courts' wide-ranging application of the KCPA. *See id.* at *4 (citing *Craig & Bishop, Inc. v. Piles*, 247 S.W.3d 897, 904 n. 11 (noting that the "Kentucky legislature created a statute which has the broadest application in order to give Kentucky consumers the broadest possible protection for allegedly illegal acts."). Therefore, the Court will permit Plaintiffs' claim to proceed.

The Court again acknowledges Plaintiffs' contention that Defendants failed to provide them with written agreements, but instead told them that a $90.00 fee would be assessed monthly until the principal balance of their loans was paid. As discussed above, this figure exceeds the $89.25 authorized by the statute and thus constitutes an oral agreement to collect undue fees. Defendants offer no reply to Plaintiffs' argument. Therefore, the Court will deny Defendants' motion as to this portion of the claim.

### v. Acceptance of personal checks not payable to Defendants

Plaintiffs additionally hinge their KCPA claim upon allegations that Defendants unlawfully accepted personal checks not made payable to them. *See* KRS 286.9-102(4) ("Any personal check accepted from a customer [for a deferred deposit transaction] must be payable to the licensee."). Although Defendants admit that Cunningham requested and accepted such incomplete checks, they explain that he preferred to supply the name of the payee himself in order to avoid citation during ColorTyme's yearly audit. (Docket No. 18-1 at 14.) This explanation presents questions of fact and credibility of the sort commended to the jury. As such, it provides no basis to dismiss Plaintiffs' claims at this stage.

Defendants further argue that Plaintiffs have not properly alleged that Cunningham's actions constituted the false, unfair, deceptive, or misleading practices that the KCPA targets. The Court disagrees. A reasonable jury could find a violation of the KCPA where a licensed, government-regulated business fails to comply with unambiguous statutory requirements designed to safeguard consumers.

This may be particularly true when the statute at issue protects the information provided on a consumer's personal check.  "[W]hen the evidence creates an issue of fact[] that any particularly action is unfair, false, misleading or deceptive it is to be decided by a jury." *Stevens v. Motorists Mut. Ins. Co.*, 759 S.W.2d 819, 820 (Ky. 1988).  This question of fact remains disputed and precludes summary judgment at this time.

Finally, to prevail upon their claim, Plaintiffs must show that Cunningham's acceptance of the checks caused them to suffer an ascertainable loss.  Plaintiffs admit that they incurred no monetary loss, as Defendants never deposited the checks at issue. (Docket No. 21.)  Although the Court is skeptical that Plaintiffs will withstand the requisite factual scrutiny, it will not dismiss their claim at this early stage.  As discussed above, the KCPA was designed to provide expansive protection to consumers victimized by unfair practices.  *See* KRS 367.120(1) (stating the KCPA's purpose of instituting a "strong and effective consumer protection program to protect the public interest and the well-being of both the consumer public and the ethical sellers of goods and services").  Interpreting the KCPA broadly, this Court has allowed claims wherein the "ascertainable loss" at issue is a debt.  *See Rainbow Rentals*, 2008 WL 23225154, at *3; *see also Stafford*, 262 F. Supp. 2d 776.  Moreover, Defendants cite no precedent suggesting that a debt cannot constitute the "ascertainable loss" that the KCPA contemplates.  Accordingly, the Court will allow Plaintiffs' claim to proceed.

### vi.    Usurious interest rates

The Court next turns to Plaintiffs' usury claims.  To state a claim under Kentucky's interest and usury statute, Plaintiffs must allege that Defendants knowingly took, received, reserved, or charged a rate of interest that exceeds the maximum rate permitted by statute.  *See* KRS 360.020.  Here, Plaintiffs assert that Defendants loaned them each $500.00 and charged them a monthly fee of $90.00.  These monthly fees were not merely "service charges," they say, but were deferral charges that they paid to forbear the loan from maturing, buying them additional time to repay it.  Plaintiffs submit that these charges represent an eighteen percent monthly interest rate and a yearly rate of 216%, which far exceeds Kentucky's legal

interest rate.  *See* KRS 360.010(1).  Defendants respond that this statute does not apply to deferred deposit transactions, leaving them immune to charges of usury.  They point to KRS 286.9-100(1), which provides, in relevant part, that a fee charged for entering into a deferred deposit transaction "shall be deemed a service fee and not interest."

Although the deferred deposit statute is unambiguous on its face, the Court will not rest its decision solely upon the labels that the parties have affixed to their transaction.  The transaction's substance, not its legal form, is key.

> The cupidity of lenders, and the willingness of borrowers to concede whatever may be demanded or to promise whatever may be exacted in order to obtain temporary relief from financial embarrassment, as would naturally be expected, have resulted in a great variety of devices to evade the usury laws; and to frustrate such evasions the courts have been compelled to look beyond the form of a transaction to its substance, and they have laid it down as an inflexible rule that the mere form is immaterial, but that it is the substance which must be considered.  No case is to be judged by what the parties appear to be or present themselves to be doing, but by the transaction as disclosed by the whole evidence; and, if from that it is in substance a receiving or contracting for the receiving of usurious interest for a loan or forbearance of money the parties are subject to the statutory consequence, no matter what device they may have employed to conceal the true nature of their dealings.

*Hamilton v. York*, 987 F. Supp. 953, 955-56 (E.D. Ky. 1997) (quoting *Hurt v. Crystal Ice & Cold Storage Co.*, 286 S.W. 1055, 1056-57 (Ky. 1926)).

The Court's consideration of the overall reality of the parties' arrangement raises substantial concerns.  A fact-finder could find that the transactions were simply short-term loans and that the charges that Plaintiffs incurred constituted charged interest, not service fees.  *See id.* (distinguishing between interest rates, which are charged for the use of loaned money, and service fees, which are charged for "the service of processing and providing instant cash.").  This conclusion comports with the fundamental meanings of the words "loan" and "interest":

> [A] well-known legal dictionary defines "loan" as "[d]elivery by one party to and receipt by another party of sum of money upon agreement, express or implied, to repay it with or without interest." Black's Law Dictionary 844 (5th ed. 1979). It goes on to define "interest" as "the compensation allowed by law or fixed by the parties for the use or forbearance or detention of money." *Id.* at 729.

*Id.*

Plaintiffs note that Cunningham himself characterized Thompson's $90.00 charge as a monthly fee, not an eventual deferred deposit transaction. (Docket No. 21 at 18-19; *see* Docket No. 18-8 (authorizing Cunningham to debit Thompson's account "$90.00 every month after till [sic] paid in full.").) They further argue that had each monthly payment constituted a new deferred deposit transaction, Defendants would have provided individual Deferred Deposit and Disclosure Agreements for each. (*See* Docket No. 21 at 18.)

These issues foreclose summary judgment upon Plaintiffs' allegations. The Court will therefore permit their claims of usury under both the KCPA and KRS 360.020 to proceed.

### vii.    Acceptance of no less than $25.00 over the service fee

Plaintiffs' Amended Complaint alleges that Defendants refused to allow them to apply any amount of money less than $25.00 over the "service fee" to their balances. (Docket No. 6-2 at 11.) Defendants allege that the Amended Complaint alleges no facts supporting this claim or explaining how this "conclusory statement" constitutes an unfair business practice. (Docket No. 18-1 at 16-17.) Plaintiffs elaborate upon their claim in their Response, explaining that this alleged arbitrary minimum presented an additional obstacle to paying down their balances, lengthening their period of indebtedness to Defendants. (*See* Docket No. 21 at 20-21.) They were not required, however, to provide this explanation in their Complaint. Because Plaintiffs adequately pleaded the basis of this claim, the Court will deny Defendants' motion.

**b.   KCPA claims specific to Thompson**

The Court next turns to Count III of Plaintiffs' Amended Complaint, which alleges certain violations of the KCPA specific to Thompson.  Plaintiffs first allege that Defendants unlawfully rolled over Thompson's deferred deposit transaction. They contend that her transactions with Defendants did not constitute twenty-one distinct transactions, but an initial advance of $500.00 on which she incurred $90.00 in monthly payments.  (Docket No. 21 at 20.)  Defendants insist that the transaction was comprised of a series of deferred deposit agreements rather than a single loan; they say that at the end of each thirty-day period, Thompson initiated a new transaction with Defendants by repurchasing her postdated check from them, delivering a new check, and executing a new Agreement.  (Docket No. 18-1 at 19.)

KRS 286.9-100(14) forbids lenders from charging customers for rollover transactions:  "A licensee . . . shall not for a fee renew, roll over, or otherwise consolidate a deferred deposit transaction for a customer."  *Id.*   Although lenders are may not *charge* for such transactions, the statute does not provide a blanket prohibition against them.  Because Thompson has not alleged that she incurred a fee as a result of the purported rollover transactions, Plaintiffs have failed to state a violation of KRS 286.9-100(14).  The Court will dismiss the portion of Plaintiffs' claim that is founded upon this provision.

Plaintiffs further allege that Defendants wrongfully required Thompson to guarantee Estes' debt.  (Docket No. 6-2 at 12.)  KRS 286.9-100(8) states, "No licensee shall require a customer to provide security for the transaction or require the customer to provide a guaranty from another person."  Plaintiffs allege that Cunningham told Thompson that she had guaranteed her son's debt, causing her to make payments in both of their names.  (Docket No. 6-2 at 6.)  Defendants respond that had they wished to collect Estes's outstanding debt, they would have simply deposited the check that Estes himself provided.  (Docket No. 18-1.)  Whatever the logic of this argument, it is for the jury, not the Court.  Plaintiffs have stated a claim for violation of this statute that survives Defendants' motion.

Finally, Thompson asserts that Defendants violated the KCPA by debiting her bank account without her authorization. (Docket No. 6-2 at 12.) Defendants move to dismiss this claim, pointing to the authorization drafted by Cunningham and bearing both his and Thompson's signatures. The agreement reads, in full:

> I Geneva S. Thompson give permission to debit my card on date 7/16/14 – I Geneva agree to pay Harold Cunningham on July 16th $180.00 from [credit card number, expiration date, and security code redacted] for $90 he paid on 6/23/14 and for loan due in July on 21st. I give him permission to debit my card for the $180.00 amount. And then $90.00 every month after till [sic] paid in full.

(*See* Docket No. 18-8.) Accordingly, Defendants argue that Thompson authorized Cunningham to debit her account and that they did so with her assent. Thompson responds that the contract is illegal and hence void. She further contends that Defendants continued to debit her account even after she instructed Cunningham not to do so via a July 15, 2014, voicemail. (Docket No. 21 at 22.)

In general, parties enjoy complete freedom to enter into a contract. However, courts may decline to enforce contracts that violate law or public policy. *Jack Henry & Assocs., Inc. v. BSC Inc.*, 753 F. Supp. 2d 665, 668 (E.D. Ky. 2010 (internal quotation omitted). *See also Yeager v. McLellan*, 177 F S.W.3d 807, 809 (Ky. 2005) ("[A] court may refuse to enforce a contract on grounds of illegality where the contract has a direct objective or purpose that violates . . . a statute, an ordinance, or the common law.") (citations omitted). Although the purported agreement authorizes Defendants to charge a service fee of $180.00, Kentucky law does not. *See* KRS 286.9-100(11) ("A licensee shall not use any device or agreement . . . with the intent to obtain greater charges than are authorized in this subtitle."). As Plaintiffs note, Kentucky businesses that profit from deferred deposit transactions must adhere to the provisions established by statute. Only approved fees may be charged, and for only a limited number of transactions. A written agreement must govern each such transaction and must provide certain disclosures. The language of the parties' would-be contract does not foreclose the possibility that Defendants charged a fee in excess of the statutory maximum.

21

Moreover, even if the agreement comports with the letter of the statute, public policy counsels against its enforcement.  *See Westlake Vinyls, Inc. v. Goodrich Corp.*, 518 F. Supp. 2d 947, 953 (W.D. Ky. 2007) ("Public policy is usually understood to be the principles under which the freedom of contract and private dealing is restricted by law for the good of the community.  Thus certain classes of acts are said to be against public policy and the law refuses to enforce or recognize them, on the ground that they have a mischievous tendency, so as to be injurious as to the interest of the state, apart from illegality or immorality.") (quoting *Bankers Bond Co. v. Buckingham*, 97 S.W.2d 596, 600 (1936)).  Because the Court cannot say with certainty that the agreement excerpted above violates neither Kentucky statute nor public policy, it will allow discovery to proceed and will not grant summary judgment at this time.

### c.  KCPA claims specific to Estes

The Court next turns to Plaintiffs' claims arising from Estes' allegations.  Estes alleges that Defendants applied his payment to his sister's account, held him liable on a debt that he had fully paid, and then prevented him from making timely payments and charged him additional and unlawful fees.  He further contends that Cunningham threatened him to coerce him to sign a new contract. (Docket No. 6-2 at 13.)

Defendants' motion to dismiss these claims relies primarily upon rhetorical explanations for Cunningham's alleged actions.  For example, they doubt that Estes believed that his March 1, 2014, payment was for his account rather than his sister's and contend that he did not fully pay his debt until August 2014.  (Docket No. 18-1 at 22.)  These are factual disputes, not legal questions.  Moreover, the Court has addressed Defendants' arguments concerning the KCPA's requirement of ascertainable loss in the preceding discussion.  There is no basis to dismiss Estes's claims at this stage.

**Conclusion and Order**

Therefore, based upon this analysis and the Court being otherwise sufficiently advised, IT IS HEREBY ORDERED that Plaintiffs' Motion to Amend, (Docket No. 6), is hereby GRANTED. Moreover, Defendants' Motion to Dismiss, (Docket No. 18), is hereby GRANTED IN PART and DENIED IN PART consistent with the Court's Memorandum Opinion.